## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FILED

JAN 1 1 2021

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

UNITED STATES OF AMERICA *EX REL.*
CAROL WESSNER

    26 Rodman Ave.
    Havertown, PA 19083

    *Plaintiff,*

v.

AETNA BETTER HEALTH OF PENNSYLVANIA

    2000 Market Street, Suite 850
    Philadelphia, PA 19103

AETNA, INC.

    151 Farmington Ave.
    Hartford, CT 06156

AETNA MEDICAID ADMINISTRATORS, LLC

    4500 East Cotton Center Blvd.
    Building 1
    Phoenix, AZ 85040

JASON ROTTMAN

    2000 Market Street, Suite 850
    Philadelphia, PA 19103

ALICE JEFFERSON

    2000 Market Street, Suite 850
    Philadelphia, PA 19103

    *Defendants.*

Case No. _____17-0292_____

**First Amended Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*,**

**FILED UNDER SEAL**

**DO NOT PUT ON PACER**

**Jury Trial Demanded**

CONFIDENTIAL AND UNDER SEAL— FIRST AMENDED *QUI TAM* COMPLAINT

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA, *ex rel.*

[UNDER SEAL]

     *Plaintiffs,*

v.

[UNDER SEAL]

     *Defendants.*

Case No. ___17-0292_____

**First Amended Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.***

**FILED UNDER SEAL**

**DO NOT PUT ON PACER**

**Jury Trial Demanded**

CONFIDENTIAL AND UNDER SEAL— FIRST AMENDED *QUI TAM* COMPLAINT

## INTRODUCTION

1.      *Qui tam* Relator Carol Wessner ("Wessner" or "Relator"), by her attorneys, individually and on behalf of the United States of America, files this complaint against Aetna, Inc., Aetna Medicaid Administrators, LLC ("AMA"), Aetna Better Health of Pennsylvania, Inc. ("ABHP") (the "Corporate Defendants"), Jason Rottman ("Rottman"), and Alice Jefferson ("Jefferson") (the "Individually Named Defendants") (all, collectively, "Defendants") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-32 ("FCA" or "False Claims Act"). Relator, on behalf of herself also seek damages and attorneys' fees for unlawful retaliation in violation of 31 U.S.C. § 3730(h).

2.      Hired by ABHP in May 2013, Relator was a Quality Management Nurse Consultant assigned to the role of Early Periodic Screening Diagnosis and Treatment ("EPSDT") Coordinator.

3.      As the EPSDT Coordinator, Relator worked to ensure that children under 21 years of age on Medicaid have access to EPSDT screenings and services from the child's assigned pediatric Primary Care Provider ("PCP") on ABHP's network.

4.      Defendant ABHP is a Managed Care Organization ("MCO") that has contracted with the Commonwealth of Pennsylvania ("Pennsylvania" or "the Commonwealth") to provide Medicaid recipients access to necessary care and medical services.

5.      ABHP is contractually obligated to maintain an adequate network of providers.

6.      Discussed more fully throughout, a significant number of the providers that ABHP represents as being in its network – and that are assigned to ABHP enrollees – do not have contracts with ABHP, are not pediatric PCPs, are out of state, are retired, and are dead or otherwise inaccessible (collectively, "Inaccessible PCPs").

7.     Relator repeatedly reported her findings to senior leadership at ABHP, including Rottman and Jefferson.

8.     Jefferson and Rottman instructed Relator to refrain from recording her findings in writing and, ultimately, to stop reporting her findings altogether.

9.     ABHP took little to no action to prevent the Inaccessible PCPs from being assigned patients.

10.     ABHP is aware that its provider network does not meet its contractual adequacy standards.   However, in both the contract procurement process and in periodic reporting, ABHP represented to the government that ABHP's network did meet its contractual adequacy standards.

11.     Given the way in which patients are assigned to various Pennsylvania MCOs, ABHP had a strong financial incentive to make it appear so though the Inaccessible PCPs actually saw Aetna Medicaid patients.

12.     The Commonwealth of Pennsylvania pays ABHP on a capitated per member/per month basis.  In exchange, ABHP covers the costs associated with each patient's medical services.

13.     By failing to provide an adequate network of PCPs, ABHP makes it more difficult for its enrollees to obtain medical services.  Thus, ABHP, by failing to provide an adequate provider network, decreases the number of medical services it has to cover while still being paid by the government on a capitated per member/per month basis.

14.     The Corporate Defendants violated the FCA by fraudulently inducing the Commonwealth of Pennsylvania to enter into contracts based on false representations concerning their provider network in Pennsylvania.  But-for the Corporate Defendants' false representations, Pennsylvania would not have awarded Defendants the 2010 or 2014 contracts.

15.     Defendants further violated the FCA by knowingly failing to maintain an adequate provider network as required by the HealthChoices contract between the Commonwealth and ABHP and falsely reporting on the adequacy of the network.

16.     Defendants further violated the FCA by knowingly and falsely certifying their network adequacy to the Commonwealth and creating false records that support their false representations and certifications.

17.     Defendants' false statements and representations were material to the Commonwealth's decision to enter into the 2010 and 2014 contracts and were material to the Commonwealth's decision to pay the Corporate Defendants their capitated per-member/per-month fee.

18.     Because approximately 50% of all Medicaid funding in the Commonwealth is provided by the Federal Government, the United States has been damaged by Defendants' fraudulent conduct.

19.     As a direct result of Relator's repeated efforts to report her findings to Defendants, Relator was terminated and retaliated against by Aetna Better Health Pennsylvania, Aetna, Inc., Jason Rottman, and Alice Jefferson.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendant is headquartered in and conducts business within this judicial district.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(c), 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district.  Further, many of the providers about whom Defendants made their false representations can be found in Pittsburgh, Pennsylvania, and because Defendants maintain offices in Pittsburgh, Pennsylvania.

## THE PARTIES

**RELATOR WESSNER**

23.     Relator is a citizen of the United States and a resident of Havertown, Pennsylvania.

24.     Relator is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), voluntarily provided information to the Government before filing this action, and states that her knowledge of the information contained herein has not been publicly disclosed.

25.     Relator is a registered nurse with a Bachelor of Science degree in Nursing from Villanova University.

26.     In or about May 2013, ABHP hired Relator as a Quality Management Nurse Consultant for the role of EPSDT Coordinator in Defendant's Quality Management Department.

27.     Relator reports directly to Alice Jefferson ("Jefferson").

28.     Relator's job responsibilities include investigating quality of care concerns, analyzing quality metrics via claims based data, and improving performance in quality care metrics measurements.

29.     In addition to her role as the EPSDT Coordinator, ABHP also assigned Relator to other quality management related projects.

30.     Relator had regular interactions with providers and the medical facilities affiliated with providers.

31.     Relator has direct knowledge of and access to records, documents and statements relevant to the accessibility of ABHP's provider network.

32.     After repeatedly reporting to her supervisors about the inaccessibility of ABHP's pediatric PCPs, ABHP removed Relator from her EPSDT Coordinator position and reassigned her to other projects.

33.     After Defendants reassigned Relator, Relator was then terminated and retaliated against by Aetna Better Health Pennsylvania, Aetna, Inc., Jason Rottman, and Alice Jefferson.

**AETNA BETTER HEALTH OF PENNSYLVANIA, INC.**

34.     Aetna Better Health of Pennsylvania, Inc. ("ABHP") is a managed care organization ("MCO") that administers Medicaid services to Pennsylvania Medicaid enrollees.

35.     ABHP has been operating in Pennsylvania since 2010 when it first contracted with the Department of Public Welfare ("the 2010 Contract").  In 2014, the Department of Public Welfare changed its name to the Department of Human Services ("DHS").

36.     In 2010, ABHP had contracted to only operate in two of five HealthChoices zones.

37.     In 2012, Aetna, Inc., the parent corporation to ABHP, purchased CoventryCares. Because CoventryCares operated in the three other HealthChoices zones, this purchase expanded ABHP services to all five HealthChoices zones in the Commonwealth.

38.     In 2014, ABHP bid and won a renewal of its contract with DHS (the "2014 Contract").

39.     DHS's contractual per member/per month payment agreement with ABHP requires that DHS pay ABHP an agreed upon monthly capitated fee for each member.  In return ABHP covers all covered healthcare costs for that member.

40.     ABHP serves about 180,000 members in the Commonwealth, approximately half of which are pediatric patients.

41.     ABHP has about 230 employees and has officers in the Philadelphia, Harrisburg, Blue Bell, and Pittsburg areas.

42.     ABHP failed to secure a renewal of its Medicaid contract during DHS' 2016 bid procurement. Accordingly, ABHP will be terminating its Medicaid program on June 1, 2017.

**AETNA MEDICAID ADMINISTRATORS, LLC**

43.     In 2007, Aetna, Inc. acquired Schaller Anderson, LLC, a healthcare plan administration company.

44.     Aetna, Inc. rebranded Schaller Anderson, LLC into Aetna Medicaid Administrators LLC ("AMA").

45.     AMA operates under names of Aetna Better Health to provide Medicaid managed healthcare plans in 13 states. Aetna Better Health of Pennsylvania ("ABHP") operates in the Commonwealth of Pennsylvania.

**AETNA, INC.**

46.     Aetna, Inc. is a managed healthcare company that provides healthcare and related insurance plans across the United States.

47.     Aetna, Inc. is headquartered in Hartford, Connecticut

48.     Aetna, Inc. is the parent corporation of ABHP and, through the acquisition of CoventryCare and Schaller Anderson, has taken steps to support ABHP's fraudulent conduct .

**JASON ROTTMAN**

49.     Jason Rottman ("Rottman") serves as the current CEO of ABHP.

50.     Rottman has served in this position since January 2014.

51.     On numerous occasions, Relator reported to Rottman the inadequacies of ABHP's provider network.

**ALICE JEFFERSON**

52.     Alice Jefferson ("Jefferson") is the Director of ABHP's Quality Management Division.

53.     Jefferson is Relator's immediate supervisor.

54.     On numerous occasions, Relator reported to Jefferson the inadequacies of ABHP's provider network.

**CLARK RESOURCES, INC.**

55.     Clark Resources, Inc. ("Clark Resources") is a Small Diverse Business, Minority Business Enterprise as designated by the Pennsylvania Bureau of Small Business Opportunities.

56.     ABHP uses Clark Resources as a vendor in order to fulfill ABHP's contractual obligations towards small disadvantage businesses.

57.     Clark Resources provides call center related services which includes conducting provider access and availability surveys.

58.     Clark Resources also responds to client complaint calls.

59.     Steve Morrison and Todd Gilcrist are Call Center Manager for Clark Resources

60.     Kevin Woodbury, an ABHP Business Project Manager, is the liaison between ABHP and Clark Resources.

## FACTUAL ALLEGATIONS

### I.       Medicaid Background

61.      Medicaid is a join state-federal welfare program to provide low-income people with healthcare coverage. It was authorized in 1965 by Title XIX of the Social Security Act.

62.      Each state administers their Medicaid program differently within established federal parameters.

63.      Pennsylvania's Medicaid program is referred to as Medical Assistance.

64.      The MCOs that administer Pennsylvania's Medical Assistance operate under the HealthChoices Program.

65.      Each year, Pennsylvania's Federal Medicaid Assistance Percentage is between 50% and 60%.

### II.      Aetna's Contracts with the Commonwealth of Pennsylvania

66.      Pennsylvania is divided into five zones under the HealthChoices Program.

67.      DHS, during its procurement process, solicits proposals from MCOs for each of the five zones.

68.      DHS then selects MCOs to administer the Commonwealth's Medicaid plan for each of the five zones. Each zone may have multiple MCOs providing Medicaid services and each MCO may serve multiple zones.

### A. ABHP's 2010 Contract with Pennsylvania ("The 2010 Contract")

69.      When ABHP first began operating in Pennsylvania in 2010, ABHP only operated in two of the five zones: Southeast and Leigh-Capital zones.

70.      In order to successfully bid for the contract, MCOs, like ABHP, are required to obtain an HMO Certificate of Authority from the Pennsylvania Department of Health (DOH).

71.    When applying for the HMO Certificate of Authority, ABHP was required to provide a "description of the proposed plan services area by county, including demographic data of prospective enrollees and location of contracted providers." 28 PA Code § 9.631(6).

72.    ABHP was awarded the HMO Certificate of Authority on or about January 25, 2010, based in large part upon ABHP's false representations concerning its network of contracted providers.

73.    In 2014, Aetna, Inc., the parent corporation to ABHP purchased CoventryCares which had operated in the three zones in which ABHP did not operate.

74.    After the CoventryCares purchase, ABHP administered the Commonwealth's Medicaid service in all five zones.

**B. ABHP's 2014 Contract with Pennsylvania ("The 2014 Contract")**

75.    In 2013, DHS requested proposals for its 2014 HealthChoices contract.

76.    In response to DHS's solicitation, ABHP submitted a proposal to administer Medicaid services for all five zones.

77.    The bid solicitation required each MCO to obtain a DOH Operating Authority letter for each county in which they planned to operate in.

78.    The MCO must submit a Service Area Expansion request to the DOH Bureau of Managed Care in order to obtain the Operating Authority letters for the counties for which the MCO does not yet have that letter. *See* 28 PA Code § 9.679(b).

79.    The Service Area Expansion request must include a list of participating physicians and a geographic presentation of the provider location in the service area.

80.    In its 2014 bid proposal, ABHP submitted its Operating Authority letters for the following eighteen (18) counties: Adams, Berks, Bucks, Chester, Cumberland, Dauphin,

Delaware, Franklin, Fulton, Huntingdon, Lancaster, Lebanon, Lehigh, Montgomery, Northampton, Perry, Philadelphia and York.

81.     In its 2014 bid proposal, ABHP also reported that it had submitted a Service Area Expansion request to the DOH for the remaining forty nine (49) Pennsylvania counties. According to ABHP's 2014 bid proposal, along with the request, ABHP included documentation that purported to support a "robust contracted network."

82.     DHS' 2014 solicitation also required each MCO to submit its most recent National Committee for Quality Assurance (NCQA) Health Plan accreditation level or a New Health Plan Accreditation.

83.     ABHP, in its proposal, submitted a NCQA New Health Plan Accreditation and reported that it will maintain its accreditation with the NCQA throughout the duration of the contract.

### C.  Network Accessibility Requirements of the 2010 and 2014 Contracts

84.     ABHP's 2010 contract with the Commonwealth required ABHP to "establish and maintain adequate Provider Networks to serve all of the eligible HealthChoices Populations," and to "have written Provider Agreement with a sufficient number of Providers to ensure Member access to all Medically Necessary services covered by the HealthChoices Program."

85.     Exhibit AAA of ABHP's 2010 contract also required the following accessibility and composition standards from ABHP's provider network:

> a.  Every member in an urban area must have access to at least two (2) primary care providers with open panels within thirty (30) minutes of travel time;

b. Every member in a rural area must have access to at least two (2) primary care providers with open panels within sixty (60) minutes of travel time;

c. Every pediatric member in an urban area must have access to at least two (2) pediatric PCPs with open panels within 30 minutes of travel time;

d. Every pediatric member in a rural area must have access to at least two (2) pediatric PCPs with open panels within 60 minutes of travel time;

e. The network must include a sufficient number of contracted Federally Qualified Health Centers ("FQHCs") and Rural Health Clinics, where available in order to ensure a travel time of thirty (30) minutes for urban members and sixty (60) minutes for rural members;

f. 75-100% of the network must consist of providers who have completed a residency in family medicine, osteopathic general medicine, internal medicine, or pediatrics; and

g. No more than 25% of providers without the required residencies, but have at least five (5) out of the last seven (7) years of practice in family medicine, osteopathic general medicine, internal medicine or pediatrics.

86. ABHP's 2014 contract with the Commonwealth required that ABHP's provider network meet the requirements of 28 Pa. Code §§9.671-9.685 relating to availability and access to services. Accordingly, ABHP's network is contractually required to ensure that at least 90% of its enrollees in each country have access to Medicaid services:

a. within 20 miles or 30 minutes travel from a member's residence or work in a county designated as metropolitan statistical area; or

b. within 45 miles or 60 minutes travel from a member's residence or work in any other county.

87. Discussed more fully below, the Corporate Defendants fail to meet these minimum network adequacy requirements, report false statistics to the Commonwealth concerning their network adequacy, and create false business records in support of their false statements and certifications.

**III.    Relator's Job Responsibilities**

88. Congress introduced the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) program into Medicaid in 1967 to address a deficiency of preventative healthcare services for Children under 21 years of age on Medicaid.

89. The Centers for Medicare and Medicaid Services ("CMS") encourages pediatric members to have periodic EPSDT visits to their pediatric PCP in accordance with the state's medical periodicity schedule.

90. In order to facilitate this goal of periodic EPSDT visits, ABHP's HealthChoices contract requires ABHP to establish and maintain a protocol of reminders, follow-ups and outreach to enrollees including:

a. written notice of upcoming or missed appointments;

b. telephone reminders and follow-up for missed appointments;

c. offers for assistance with transportation prior to each due date of the child's EPSDT visit;

d. if necessary, home visits for non-compliant enrollees; and

e. outreach and follow up with County Children and Youth Agencies and Juvenile Probation Offices for all enrollees under the age of 21.

91.     In May 2013, when Relator began her role as ABHP's EPSDT Coordinator, ABHP's EPSDT screening rate was far lower than Pennsylvania's average, which, between 2013 and 2015, was between 58% and 66%. Relator's primary job was to investigate why ABHP enrollees were not receiving these screenings and, as required by the contract and by law, to improve upon the screening rate.

92.     In June 2013, Relator worked with Chuck Priest and Kathy Fannin from the AMA headquarters in Arizona to update ABHP's monthly EPSDT Compliance report.

93.     The updated monthly EPSDT Compliance report, compiled as an Excel spreadsheet, included the names and demographic information of each pediatric enrollee along with the name and address of that enrollee's assigned pediatric PCP.

94.     The report also used EPSDT claims data to include the date of the last EPSDT visit within the previous twelve months.

95.     Relator used the monthly EPSDT Compliance report to identify which providers had low annual EPSDT visit rates.

## IV.    Inaccessible PCPs

96.     ABHP blamed its low EPSDT visit rate on the Medicaid children's parents' unwillingness to get annual EPSDT visits for their children.

97.     ABHP also accused their network of pediatric PCPs of discriminating against Medicaid enrollees by refusing to perform annual EPSDT visits.

98.     However, during the course of her investigation, Relator never encountered an ABHP pediatric PCP who discriminated against children on ABHP Medicaid. Rather, many of the PCPs to whom children were assigned (i) were not contracted with ABHP; (ii) were dead; (iii) were out of state; or (iv) did not see children at all.

99.     Relator's analysis of the monthly EPSDT compliance report involved identifying providers with low annual EPSDT visit rates and then calling those providers to inquire about their low annual EPSDT visit rates.

100.    While attempting to conduct these call, Relator realized that many of the provider's contract information and addresses available from ABHP's system were incorrect.

101.    When Relator did get in contract with a provider who had a low annual EPSDT visit rate, Relator was told that the PCP did not work at the practice, did not accept ABHP insurance, or did not practice as a PCP.  Relator realized that many of the PCPs listed on ABHP's network were inaccessible to the Medicaid enrollees assigned to them.

102.    Relator repeatedly reported this network inadequacy to her managers, including Jason Rottman, the CEO of ABHP.

103.    Relator, as the EPSDT coordinator, requested to add the following two additional sets of data to the monthly EPSDT Compliance reports:

        a.   The Tax ID Number (TIN) of the assigned PCP's affiliated facility; and

        b.   The Tax ID Number (TIN) of the facility that ABHP paid for performing the annual EPSDT visit.

104.    A mismatch between the above two sets of TIN data would indicate that the enrollee did not receive their EPSDT visit from the assigned PCP.

105.    After several months, in April 2014, Relator finally had the two additional sets of data included into the monthly EPSDT Compliance report.

106.    Also around April 2014, Jefferson required Relator to conduct in-person visits with pediatric PCP practices about their low annual EPSDT visit rates.

107. During her investigation, Relator encountered numerous providers and provider facilities that were inaccessible to the Medicaid enrollees assigned to them because:

    a. ABHP no longer contracted with the PCP or the PCP's assigned facility;

    b. The assigned physician was not a pediatric PCP;

    c. The PCP did not see pediatric patients;

    d. The PCP did not accept ABHP insurance;

    e. The PCP was out of state or practiced in an unreasonably distant facility to the enrollee;

    f. The contact information and address for the PCP was incorrect; and

    g. The assigned PCP was retired, dead or otherwise inaccessible.

108. On numerous occasions, Relator reported these concerns to her superiors at ABHP.

109. On or about March 2015, Relator was transferred out of her role as EPSDT coordinator into the role of lead quality manager on a CMS Dental project.

110. Identified in the following paragraphs, Relator discovered that tens of thousands of children were assigned to PCPs that had no relationship whatsoever to ABHP, despite Defendants' representations to the government that all were in network.

**A. Philadelphia Department of Health City Health Centers**

111. A Federally Qualified Health Centers (FQHC) provides medical services to underserviced areas and populations.

112. ABHP is contractually obligated to contract with a "sufficient" number of FQHCs.

113.    The Philadelphia Department of Health has eight (8) City Health Center which are all FQHCs.

114.    Dr. Thomas Storey works for the Philadelphia Department of Health as the Director of the department's City Health Centers.

115.    On or about May 7, 2014, Relator met with Dr. Storey to discuss the low annual EPSDT visit rate at the City Health Centers.

116.    During the meeting, Dr. Storey's assistant handed him a letter the department had just received from ABHP.

117.    The letter informed Dr. Storey that ABHP was terminating its contract with the Philadelphia Department of Health and its eight (8) City Health Centers.

118.    The letter also included a contract termination notice for the Greater Philadelphia Health Action, Inc., and its seven (7) locations.

119.    The Greater Philadelphia Health Action, Inc., locations are also FQHCs.

120.    On May 8, 2014, the Philadelphia Department of Health emailed Relator about the termination citing the dramatic impact ABHP's sudden decision would have on the patients who have received care at the City Health Centers for years.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* FIRST AMENDED COMPLAINT
*United States ex rel. Wessner v. Aetna, Inc., et al.*
18

121.   Dawn Choi from ABHP's Provider Relations responded to the email declaring that ABHP had made a "business decision" in terminating their contract with the City Health Centers.



122.    In August 2014, Darlene Demore from ABHP's Regulatory Communications emailed Stephanie Calazzo of ABHP's Network Management to confirm that the eight (8) City Health Centers, and the seven (7) Greater Philadelphia Health Action facilities were being terminated.





124.    Although the Philadelphia Department of Health City Health Centers received this termination notice in May 2014, in February 2015 – almost a year later – ABHP still had 491 children enrolled with the department. Some of the children were enrolled as recently as February 1, 2015.

125.    Relator reported this information to her manager Jefferson.



126.    As of September 2016's monthly EPSDT compliance report – generated more than 27 months after the City Health Centers received its termination letter from ABHP – there were still about 249 children assigned to PCPs from this facility.

127.    Of those assigned to the City Health Centers, most did not have an annual EPSDT visit recorded within the previous year. The few that did, received their EPSDT visit from an unassigned PCP at a different facility.

128.    As of September 2016's monthly EPSDT compliance report – generated more than 27 months after the Greater Philadelphia Health Action, Inc. received its termination letter from ABHP – there were still about 348 children assigned to PCPs at this facility.

129.    Of those assigned to the Greater Philadelphia Health Action, Inc., at least 210 children, or about 60.34%, did not have an annual EPSDT visit recorded within the previous year.

**B.  Reading Health Physicians Network**

130.    Reading Health Physicians Network is a physician-led network of healthcare centers with all its 45 locations in and around Berks County.

131.    Reading Health Physicians Network's contract with ABHP was terminated in 2014.

132.    As of September 2016's monthly EPSDT compliance report – almost two years after ABHP terminated its contract –1,127 children were still assigned to the Reading Health Physicians Network.

133.    Of those assigned to the Reading Health Physicians Network, at least 736 children, or about 65.30%, did not have an annual EPSDT visit recorded within the previous year.

### C.  Health Access Network

134.    The Health Access Network operates under the name Crozer-Keystone Health Network.

135.    On or about February 17, 2015, Relator emailed Dawn Choi from ABHP's Provider Relations, informing her that the 1,450 children assigned to this provider have a very low EPSDT visit rate.

136.    Relator further explained that children, including 2 year old boys, were assigned to gynecologists, hospitalists, and vascular surgeons. ABHP also had wrong addresses, phone numbers and affiliations for the PCPs at this site.

137.    In a later email on or about February 17, 2015, Relator informed Choi that the

Health Access Network's credentialing department had sent updated PCP information to ABHP,

but those updates were "never recognized."



138.    As of September 2016's monthly EPSDT compliance report – generated about 17

months after Relator's emails about the Health Access Network – 747 children, or a staggering

96.64%, assigned to Health Access Network did not have an annual EPSDT visit recorded within

the previous year.

**D. Conemaugh Memorial Medical Center and Health System**

139.    Conemaugh Health System is one of the largest healthcare providers in west

central Pennsylvania.

140.    The Conemaugh Memorial Medical Center is the flagship hospital of Conemaugh

Health System.

141.    The Conemaugh Health System's contract with ABHP was terminated in 2014.

142.    As of September 2016's monthly EPSDT Compliance report – generated about

two years after Conemaugh Health System's contract termination – 369 children were still

assigned to PCPs at these facilities.

143.    Of those assigned to the Conemaugh Health System, at least 194 children, or about 52.57%, did not have an annual EPSDT visit recorded within the previous year, while those that did, received their EPSDT visit at a different facility.

**E.  Mercy Health System**

144.    Mercy Health System is a network of acute care hospitals and other facilities that serves the Philadelphia metropolitan area.

145.    Mercy Health System's contract with ABHP was terminated on December 31, 2014.



146.    In April 2015,  there were still 532 children assigned to PCPs at Mercy Health System. Some of the children were enrolled after Mercy Health System's contract terminated.

147.    As of September 2016's monthly EPSDT compliance report – generated about 21 months after Mercy Health System's contract terminated – 160 children were still assigned to PCPs at Mercy Health System.

148.    Of those assigned to the Mercy Health System, at least 137 children, or about 85.63%, did not have an annual EPSDT visit recorded within the previous year.

**F. Lehigh Valley Physicians Group**

149.    In February 2015 the Lehigh Valley Physicians Group did not have an active contract with ABHP.

150.    Relator reported to Dawn Choi, from ABHP's Provider Relations, that many ABHP enrollees were assigned to PCPs at Lehigh Valley Physicians Group ("LVPG") sites that did not participate in ABHP's network.



151.    As of September 2016's monthly EPSDT Compliance report – generated more than 18 months after Relator's email about children being assigned to PCPs at non-participating LVPG sites – there was still about 893 children assigned to receive EPSDT visits from LVPG PCPs under LVPG's Tax ID Number (TIN).

152.    Of those assigned, at least 594 children, or about 66.52%, did not have an annual EPSDT visit recorded within the previous year.

### G. University of Pennsylvania Health System

153.    ABHP terminated its contract with the University of Pennsylvania Health System clinical practice on or before May of 2014.

154.    As of September 2016's monthly EPSDT Compliance report – generated more than 27 months after the termination of the University of Pennsylvania Health System's contract – there were still about 24 children assigned to receive EPSDT visits from the University.

155.    Eighteen (18) of these assigned children, or about 75%, did not have an annual EPSDT visit recorded within the previous year, while the few that did, received their EPSDT visit from an unassigned PCP at a different facility.

### H. Sadler Health Center

156.    Sadler Health Center ("Sadler") is a FQHC whose physicians participate in ABHP's network.

157.    On or about December 15, 2014, Mitzi Richard, Sadler's Billing Manager, emailed ABHP with a list of PCPs who no longer worked at Sadler but were still included in ABHP's network as affiliated with Sadler.

158.    The list included Dr. Harold Kretzing and Dr. Karla Hemphill-Harris who left Sadler in 2011, but were still included as Sadler PCPs in ABHP's network in December, 2014.

**From:** Mitzi Richard
**Sent:** Monday, December 15, 2014 1:07 PM
**To:** Nusrat, Sumaia
**Cc:** Stacy Kutz
**Subject:** Termed providers
**Importance:** High

Sumaia- I'm looking at our December Roster and still see providers listed who have not been with Sadler Health Center for a long time. I'm listing the providers with their termination dates.

| | |
|---|---|
| Louis Heib | 6/10/12 |
| Marlene Ascione | 4/23/14 |
| Harold Kretzing | 12/31/11 |
| Luan Pham | 12/26/13 |
| Karla Hemphill-Harris | 6/10/11 |
| Kirsten Forysthe | 6/27/14 |

Can you please transfer their members to "Sadler Health Center" as there PCP? Also, make sure they cannot be assigned to any member in the future. As you can see from some of the term dates this has been an issue for a long time. Would you please confirm when our members PCP assignment have been corrected. Thank you

*Mitzi Richard*

159.    Mitzi Richard repeated her request again in January 2015, because ABHP failed to update their network information about Sadler Health Center PCPs.

160.    ABHP's Provider Relations representative finally responded to Sadler informing her that ABHP could not make the corrections "as that is how [our] system is set up," and that those PCPs will continue to show as affiliates of Sadler.

161.    Mitzi Richard found ABHP's response "unsettling," astutely pointing out that ABHP' conduct leads to "a misrepresentation of the true PCP."



### I.   Primary Care Health Services, Inc.

162.   On or about January 20, 2015, Relator called Dr. Barnett of Primary Care Health Services, Inc. to discuss the facility's low 16% annual EPSDT visit rate.

163.   During their discussions, Dr. Barnett pointed to ABHP's network problems that lead to children being assigned to PCPs who had left Primary Care Health Services years ago, who do not see pediatric patients, or physicians who are not PCPs.

164.    Dr. Barnett also provided ABHP an updated list of Primary Care Health Services PCPs.

165.    In an email on January 20, 2015, Dr. Barnett informed ABHP that ABHP's list of Primary Care Health Services PCPs included inaccurate information including four (4) PCPs who were no longer practicing at the facility and several others who had incorrect addresses.

From: E Michael Barnett [mailto:embarnett@pchspitt.org]
Sent: Tuesday, January 20, 2015 4:19 PM
To: Wessner, Carol A
Cc: Mary C Franciscus; Diana Nieder
Subject: RE: [SEND SECURE] Aetna Better Health-EPSDT

Hi Carol,

To get started I have attached a file containing updates for the providers on the list you sent.
Four are no longer with PCHS. And several others had incorrect addresses.

Also I checked with our billing supervisor who asked if an updated patient roster could be provided.
Please send to Mary C. Franciscus, Billing Supervisor and Diane Nieder RN Nursing Director.

I included a list of all our providers by NPI and a directory of our sites.
Please let me know if they need to be added to your network.

Thank you for bringing this to my attention.

E. Michael Barnett MD
Director of Health Services
Primary Care Health Services, Inc
7227 Hamilton Avenue
Pittsburgh, PA 15208
embarnett@pchspitt.org
Voice: 412-244-4977

## J.    Specialists listed as Pediatric PCPs

166.    In February 2015, as part of her work as the EPSTD Coordinator, Relator emailed Dawn Choi, in ABHP's Provider Relations, a list of 67 children who were assigned to obstetricians and gynecologist.

167.    On or about February 18, 2015, Relator emailed her manager Jefferson informing her that children were being assigned to obstetricians and gynecologist and that ABHP's internal system is aware that these physicians were obstetricians and gynecologist, and not PCPs.

> **From:** Wessner, Carol A
> **Sent:** Wednesday, February 18, 2015 9:37 AM
> **To:** Jefferson, Alice W
> **Subject:** OB Gyns as Pediatric PCP's
>
> Alice,
>
> Regarding all the children being assigned to Gyn's as PCP. I checked this in QNXT, and it appears that our systems do know that these are OB/GYNs, and not PCP's, but the kids are assigned anyway. We'd had a question when this all started about whether or not our systems know these were not PCP's. Our systems know.

168.    Jefferson replied that obstetricians and gynecologist can also function as PCPs.

> **From:** Jefferson, Alice W
> **Sent:** Wednesday, February 18, 2015 9:43 AM
> **To:** Wessner, Carol A
> **Subject:** RE: OB Gyns as Pediatric PCP's
>
> that is because OBGYNs can be PCPs. This came to the age we assigned and they are working or correct that
>
> Thank you
>
> Alice Jefferson

169.    Relator responded by pointing out that this particular group of obstetricians and gynecologist never agreed to be PCPs and that none of the children were ever seen by these obstetricians and gynecologists.

> **From:** Wessner, Carol A
> **Sent:** Wednesday, February 18, 2015 9:46 AM
> **To:** Jefferson, Alice W
> **Subject:** RE: OB Gyns as Pediatric PCP's

170.    As of September 2016, ABHP's network contained, *inter alia*, the following specialists who have never consented to operating as pediatric PCPs and therefore are inaccessible to the children assigned to them.

    a.   Dr. Joseph G. Grover is an obstetrician

    b.   Dr. Anne Raunio is an obstetrician

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* FIRST AMENDED COMPLAINT
*United States ex rel. Wessner v. Aetna, Inc., et al.*

c.  Dr. Susan Weil is an obstetrician

d.  Dr. Steven Troy is an obstetrician

e.  Dr. Barry J. Jacobson is a gynecologist

f.  Dr. Elizabeth J. Louka is a gynecologist

g.  Dr. Edward Hovick is a nephrologist

h.  Dr. Shalanki Baiswar is a nephrologist

i.  Dr. Marc A. Georgi is a gastroenterologist

j.  Dr. Richard M. Plotzker is an endocrinologist

k.  Dr. Jane F. Brooks is an oncologist

l.  Dr. Thomas Turissini is a cardiologist

## K.  Retired and Dead Physicians Listed as Active Pediatric PCPs

171.    As of September 2016, ABHP's network contained, *inter alia*, the following PCPs who retired or passed away and therefore were inaccessible to the children assigned to them.

a.  Dr. John C. Kalata retired in 2014 and died in June, 2015.

b.  Dr. Harry Johnson died in March, 2016.

c.  Dr. Robert Mrkich died in April, 2016.

## L.  Bradford County Pediatric PCPs

172.    According to the September 2016 EPSDT Compliance report, ABHP claims to be contracted with 45 pediatric PCPs in and around Bradford County.

173.    However, only eight (8) of the PCPs listed as practicing in or around Bradford County are accessible to ABHP enrollees. The remaining PCPs do not have current contracts with ABHP, do not see children under 18 years of age, are at capacity, are not PCPs, are out of state, are not at the listed facility, are retired, or are otherwise inaccessible.

a.  Dr. Lopamudra Acharya practices in Massachusetts. Her Pennsylvania license expired on December 31, 2014.

b.  Dr. Sukirti Bista left Pennsylvania several years ago.

c.  Dr. Rebecca L. Bjorck moved to New York.

d.  Dr. Erba Carskadden moved to Arizona.

e.  Dr. Lisa E. Ceraolo does not see pediatric patients.

f.  Dr. Mark J. Corey has a full panel and cannot take on any more patients.

g.  Dr. Debra A. Cyrus moved to Virginia.

h.  Dr. Sujata Das left the facility at the end of 2016.

i.  Dr. Deepakraj Gajanana moved to Fort Washington in Philadelphia.

j.  Dr. Carlos A. Garcia is a hospitalist, not a PCP.

k.  Dr. Himan Goli moved to Maryland.

l.  Dr. Edward L. Jones retired.

m.  Dr. Abhash Joshi no longer works at the associated facility.

n.  Dr. Anumeha Kohli moved to Texas in 2013.

o.  Dr. Daniel Michael Kohn moved to Arizona.

p.  Dr. Victor Kolade does not see pediatric patients.

q.  Dr. Korie D. Lambert moved to North Carolina.

r.  Dr. Thomas A. Lesson moved to Arizona.

s.  Dr. Aswini Mandhadh  no longer works at the associated facility.

t.  Dr. Megha Manek moved to Illinois and joined the Southern Illinois University in September 2016.

u.  Dr. Clarence J. Mast no longer works at his associated facility and has moved to Meshoppen in Wyoming County.

v.  Dr. John McIntyre no longer works at his associated facility.

w.  Dr. Robert W. Meikle does not see pediatric patients.

x.  Dr. Lon A. Ovedovitz moved to New York.

y.  Dr. John V. Pamula is an internist, not a pediatric PCP.

z.  Dr. Donald E. Phykitt has a full panel and cannot take on any more patients.

aa. Dr. Karen E. Saylor moved to Maine.

bb. Dr. David A. Shaller no longer works at his associated facility.

cc. Dr. Constance M. Sweet does not accept ABHP insurance.

dd. Dr. Angela Tama-Zang does not accept ABHP insurance.

ee. Dr. Rupak Thapa moved to South Carolina.

ff. Dr. Paul R. Webb could not confirm if he accepted Aetna insurance.

gg. Dr. Violeta Zeykan does not see pediatric patients.

**M. Pike County Pediatric PCPs**

174.    According to the September 2016 EPSDT Compliance report, ABHP claims to be contracted with five (5) pediatric PCPs in or around Pike County.

175.    However, none of the PCPs listed as practicing in or around Pike County are accessible to ABHP pediatric enrollees.

a.  Dr. Charles Aronica does not accept ABHP insurance.

b.  Dr. Jane F. Brooks does not see pediatric patients.

c.  Dr. Robert A. Johnson does not see pediatric patients.

    d.  Dr. Yitzhok B. Kurtzer does not see pediatric patients.

    e.  Dr. Theresa A. Lafranco moved to New Jersey.

**N.  Data Analysis Reveals Significant Network Inadequacies**

176.    Before April 2014, the monthly EPSDT Compliance report consisted of the following information for each enrolled pediatric member:

    a.  First and last name of the enrollee;

    b.  The enrollee's county of residence;

    c.  The name of the enrollee's assigned PCP;

    d.  The assigned PCP's affiliated facility;

    e.  The address and phone number of the PCP's affiliated facility; and

    f.  The date of the last annual EPSDT visit within the last twelve months.

177.    Using only the information above Relator could determine which enrollees had an annual EPSDT visit, but could not determine if the enrollee's assigned PCP conducted the EPSDT visit.

178.    In order to determine which PCPs conducted the annual EPSDT visit, Relator had the following two columns added to the monthly EPSDT Compliance report beginning in April 2014:

    a.  Tax ID number (TIN) of the assigned PCP's affiliated facility; and

    b.  Tax ID number (TIN) of the facility of the PCP that conducted the last EPSDT visit.

| Last name | First name | AGE | Pay To TIN Last EPSDT Visit | LastPhoneCare ReadDate | Member County | PCPName | PCP Addr1 | PCP City | PCP ZIP | PCP phone | PCP Affiliation | Affiliation TIN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2 | 251403958 | 4/25/2016 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |
| | | 11 | 251403958 | 2/22/2015 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |
| | | 2 | 251403958 | 8/17/2016 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |
| | | 5 | 251403958 | 8/23/2016 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |
| | | 4 | 251403958 | 4/26/2016 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |
| | | 1 | 251403958 | 3/29/2016 | Erie | Zychsko-Dmnc | 4500 Pine Ave | Erie | 16504 | (814) 877-5800 | REGIONAL HEALTH SE | 251403958 |

179.    Relator reasoned that when the TIN of the assigned PCP's affiliated facility matched the TIN of the facility of the PCP that conducted the last EPSDT visit, then the assigned PCP properly conducted the last EPSDT visit.

180.    Relator further reasoned that when the TIN of the assigned PCP's affiliated facility did _not_ match the TIN of the facility of the PCP that conducted the last EPSDT visit, then a PCP not assigned to the enrollee conducted the last EPSDT visit.

181.    ABHP enrollees who got their annual EPSDT visit from a PCP not assigned to them, did so because they were unable to access their assigned PCP.

182.    The EPSDT Compliance report from September 2016 consists of 99,403 pediatric enrollees assigned to 5,774 PCPs.

183.    2,839 PCPs, out of 5,774 PCPs, or 49.17%, *had not seen a single one of their assigned patients* for an annual EPSDT visit within the last twelve months.

184.    In addition, of the remaining 2,935 PCPs who conducted any annual EPSDT visit for their assigned patients, *1,708 PCPs did so for less than half of their assigned patients*.

185.    Given that Pennsylvania had a participation ratio of 66% of pediatric enrollees receiving at least one EPSDT screening in 2015, a PCP who saw less than half of its assigned patients is inaccessible to its other patients due to the PCP:

    a.    being at capacity and unable to see any additional assigned patients; or

    b.  leaving the facility or leaving the Commonwealth during the middle of the

        twelve month period; or

    c.  retiring or passing away in the middle of the twelve month period.

186.    Accordingly, only 1,227 PCPs out of the total 5774 PCPs on ABHP's network, (21.25%) saw any or at least half of their assigned patients.

187.    The remaining PCPs were inaccessible to ABHP's enrollees[1]:

    a.  Dr. Shalanki Baiswar did not see any of her 66 assigned patients for an annual EPSDT visit.

    b.  Dr. Bernard C. Proy did not see any of his 60 assigned patients for an annual EPSDT visit.

    c.  Dr. Lawrence K. Alwine did not see any of his 43 assigned patients for an annual EPSDT visit.

    d.  Dr. Maria S. Kobylinski did not see any of her 41 assigned patients for an annual EPSDT visit.

    e.  Dr. Frank L. Conly saw only 5 out of his 98 assigned patients for an annual EPSDT visit.

    f.  Dr. Gary R. Salzman saw only 9 out of his 168 assigned patients for an annual EPSDT visit.

    g.  Dr. Babak Behta saw only 11 out of his 104 assigned patients for an annual EPSDT visit.

---

[1]     Only a sample of the inaccessible PCPs is included in the body of this complaint. However, the full list of inaccessible PCP is available in Attachment 1 which accompanies this complaint.

h.  Dr. John M. Anderson saw only 13 of his 117 assigned patients for an annual EPSDT visit.

i.  Dr. Ihab A. Dana saw only 18 of his 90 assigned patients for an annual EPSDT visit.

j.  Dr. Mayssa M. Abuali saw only 19 of her 123 assigned patients for an annual EPSDT visit.

k.  Dr. Ralph D. Hawks saw only 16 of his 122 assigned patients for an annual EPSDT visit.

l.  Dr. Joseph F. Mussoline saw only 32 of his 122 assigned patients for an annual EPSDT visit.

188.    At least the following four (4) counties in Pennsylvania did not have a single accessible PCP in September 2016:

a.  Potter County;

b.  Jefferson County;

c.  Perry County; and

d.  Forest County.

189.    While this data analysis focused on the inadequacies of ABHP's pediatric PCP network, such network access inadequacies also extend into the entire ABHP provider network.

## V.    Aetna Submitted Numerous False Statements and Claims for Payment to Medicaid

### A.  HMO Certificate of Authority

190.    ABHP was required to maintain an HMO Certificate of Authority in order to bid for the 2010 Contract.

191.    In order to obtain a HMO Certificate of Authority necessary to its bid for the 2010

Contract, ABHP submitted to the Pennsylvania Department of Health (DOH) a description of its

proposed plan services area by county and the location of its contracted providers.

192.    In so doing, ABHP falsely represented the adequacy of its network by including

providers that ABHP knew were inaccessible in order to obtain a HMO Certificate of Authority

to bid on the 2010 HealthChoices contract.  But for this misrepresentation, ABHP would have

been ineligible to bid on the 2010 Contract.

**B.  Service Expansion Request**

193.    ABHP required DOH Operating Authority Letters for every Pennsylvania county

in order to bid for the 2014 Contract.

194.    In preparation for the 2014 bid solicitation, ABHP submitted a service area

expansion request to the DOH Bureau of Managed Care.  This was required in order for ABHP to

obtain DOH Operating Authority Letters for counties on which ABHP had not previously bid.

195.    According to ABHP's 2014 bid proposal, ABHP's service area expansion request

included documentation that purported to support a "robust contracted network."

196.    In doing so, ABHP falsely represented the adequacy of its network by including in

its network providers that ABHP knew were inaccessible in order to obtain a DOH Operating

Authority Letter in order to bid on the 2014 HealthChoices Medicaid contract.  But for this

misrepresentation, ABHP would have been ineligible to bid on the 2014 Contract.

197.    Part of the enrollment process for new Medicaid recipients involves selecting a

PCP on the Enrollnow.net website maintained by PA Enrollment Services, before selecting an

insurance that their selected PCP accepts.

198.    If an enrollee does not make a selection, the enrollee is auto-assigned a PCP in a process where each MCO operating in that enrollee's county has an equal chance of being selected.

199.    MCOs are only allowed to operate in a county in which that MCO has service expansion request granted by DOH. DOH grants such request after that MCO represents that its network can adequately serve every potential enrollee in that county.

200.    ABHP knows that it can be auto-assigned new Medicaid enrollees and be presented as an MCO option to new Medicaid enrollees, only if ABHP can represent to the Commonwealth that it has an adequate PCP network in the new enrollee's county.

201.    Without such a representation, the Commonwealth will not auto-assign new Medicaid enrollees to ABHP and will not include ABHP as an MCO option for new Medicaid enrollees.

202.    ABHP knows that each new Medicaid enrollee who selects ABHP or is auto-assigned to ABHP increase the capitated per member/per month payment that ABHP collects from Medicaid.

203.    ABHP misrepresented the adequacy of its network by including providers that ABHP knew were inaccessible in order to gain new Medicaid enrollees that would increase ABHP's per member/per month payment from Medicaid.

204.    Because ABHP misrepresented its network adequacy, ABHP is allowed to operate in counties where it does not have an adequate network, including in counties where ABHP does not have a single accessible PCP.

### C. Provider Network Report of Deletions and Additions

205.    ABHP is contractually required to submit an annual Provider Network Report of Deletions and Additions, and provide quarterly updates to that report.

206.    The Commonwealth uses this report and its related updates to maintain the accuracy of the list of PCPs on the EnrollNow.net website from which a new Medicaid enrollee choses a PCP or is assigned to one.

207.    ABHP knows that by fraudulently inflating its PCP network through the inclusion of PCPs that ABHP knows to be inaccessible, ABHP increases the chances of a new Medicaid enrollee selecting one of its PCPs, which in turn increases ABHP's per-member/per-month payment from Medicaid.

208.    ABHP also knows that by failing to remove inaccessible PCPs from its network, ABHP avoids having to cover the cost of medical services otherwise incurred if the PCP was accessible.

209.    ABHP falsely represent the adequacy of its network by including providers that ABHP knew were inaccessible into its Provider Network Report of Deletions and Additions and related updates in order to increase ABHP's per member/per month payment from Medicaid and decrease the amount of medical services it would have to cover.

### D. Managed Care Accessibility Analysis

210.    ABHP submits a Managed Care Accessibility Analysis which purports to measure Aetna's network adequacy against its contractual obligation of ensuring PCPs are within a required travel time to every enrolled member.

211.    The Managed Care Accessibility Analysis is generated by the GEOAccess team using Aetna Better Health PENN Network Report.



212.    However, ABHP misrepresents the adequacy of its network in these reports by including providers that ABHP knew were inaccessible in order to fraudulently maintain purported compliance with the 2010 Contract and the 2014 Contract.

**E.   The Healthcare Effectiveness Data and Information Set (HEDIS)**

213.    Pennsylvania's Department of Human Services (DHS) requires MCOs like ABHP submit to the department performance data which includes HEDIS reports, CAHPS survey reports and Pennsylvania Performance Measures.

214.    HEDIS is a performance evaluation tool that uses various measures to determine the effectiveness of the care provided to the MCO's enrollee population.

215.    In addition, the National Committee of Quality Assurance (NCQA) also uses the HEDIS, *inter alia*, in its accreditation of MCO healthcare plans.

216.    ABHP contracts with Inovalon, a private technology company, to generate the HEDIS reports. Inovalon uses ABHP's claims data to generate the HEDIS report.

217.     HEDIS only accounts for enrollees who meet a "continuous enrollment criteria," which varies from year to year, but generally requires the enrollee to be continuously enrolled in the plan.

218.     However, a significant section of ABHP's enrollee population leaves ABHP for another MCO due to the lack of accessible PCPs.

219.     This "churning," where enrollees move between MCOs, is not adequately accounted for in the HEDIS reports due to the report's "continuous enrollment criteria."

220.     Thus, ABHP benefits from its own misconduct insofar as enrollees that cannot receive medical services from their assigned PCPs (because those PCPs do not accept ABHP Medicaid) are excluded from the HEDIS calculation.

221.     Nevertheless, ABHP uses the HEDIS reports to misrepresent that it is providing adequate healthcare services to its enrollee population.

**F. Annual EPSDT Participation Report (Form CMS-416)**

222.     The Centers for Medicare and Medicaid Services ("CMS") requires that states demonstrate its attainment of its EPSDT participation and screening goals.

223.     This EPSDT performance is measured and reported to CMS on Form CMS-416: Annual EPSDT Participation Report.

224.     This information assess the effectiveness of the state's EPSDT program in terms of the number of children who were enrolled for at least 90 continuous days during the reporting period and received initial or periodic annual screening.

225.     Pennsylvania first obtains the required information for the Form CMS-416 from each MCO before compiling that information and submitting it to CMS.

226.    ABHP's information required for the Form CMS-416 is provided to the Commonwealth by Jefferson.

227.    The screening data on Form CMS-416 only accounts for enrollees who were enrolled in ABHP for at least 90 continuous days during the reporting period.

228.    However, a significant section of ABHP's enrollee population leaves ABHP for another MCO due to the lack of accessible PCPs.

229.    This "churning," where enrollees move between MCOs, is not adequately accounted for in the on Form CMS-416 because the form only accounts for screening data for members who were enrolled in ABHP for at least 90 continuous days during the reporting period.

230.    Thus, ABHP benefits from its own misconduct insofar as enrollees that cannot receive medical services from their assigned PCPs (because those PCPs do not accept ABHP Medicaid) are excluded from the Form CMS-416 calculation.

231.    Therefore, ABHP's Form CMS-416 reporting misrepresents the effectiveness of its EPSDT service because many of ABHP's enrollee population leaves ABHP due to the lack of accessible PCPs. By providing false or misleading information to the Commonwealth, Defendants, including Jefferson and Rottman, are causing the Commonwealth to submit false information to the United States.

**G. Complaint Reports**

232.    ABHP is required to maintain various quality management requirements throughout the duration of its 2010 Contract and 2014 Contract.

233.    Part of ABHP's quality management protocols include recording the number and types of complaints it receives from its enrolled members.

234.    ABHP uses vendor Clark Resources to assist in resolving member complaints.

235.     When Clark Resources receives a complaint concerning that lack of provider availability, Clark Resources does not record that as a "complaint." Instead, Clark Resources records this complaints as a "PCP Change Request" or a "Request to Change Managed Care Organizations."

236.     ABHP misrepresents the adequacy of its network in these reports by knowingly mis-categorizing complaints about its network adequacy as PCP or MCO change request.

237.     ABHP maintains these false records internally and reports this information to the Commonwealth.

## VI.   The False Claims Submitted by ABHP Were Material to the Government's Decision to Pay

238.     The HealthChoices contracts allows Pennsylvania to contract with MCOs in order to provide access and necessary medical services to the Commonwealth's Medicaid enrollees.

239.     The Commonwealth awarded ABHP the HealthChoices Medicaid contract in 2010 and 2014 based on ABHP's representation of a provider network that would adequately serve the Commonwealth's Medicaid population.

240.     But-for ABHP's misrepresentation of the adequacy of its provider network, the Commonwealth would have not awarded ABHP the HealthChoices contract for 2010 or 2014.

241.      But-for ABHP' false records purporting to maintain an adequate provider network, the Commonwealth would not allow ABHP to continue its operations unabated.

242.     The Commonwealth pays ABHP on a per member/per month basis so that ABHP will provide the Commonwealth's Medicaid population with access to necessary medical services.

243.    ABHP frustrates the purpose of the HealthChoices contract by knowingly failing to maintain an adequate network and providing false records to the government about its network adequacy.

244.    These false records were material in the Commonwealth's decision to award the HealthChoices contract to ABHP and are material to the Commonwealth's decision to make the per-member/per-month payments to the Corporate Defendants.

## VII.    Defendants Acted With the Requisite Scienter

### A.    Relator informed ABHP's Senior Leadership about network inadequacies

245.    On numerous occasions, Relator informed others at ABHP, including her supervisor Jefferson and Aetna CEO Rottman, about the network inadequacies she encountered.

246.    On or about January 20, 2015, Relator informed Jefferson and Rose Malinda about inaccessible PCPs at Primary Health Care Services, Inc.

> From: Wessner, Carol A
> Sent: Tuesday, January 20, 2015 2:25 PM
> To: Jefferson, Alice W
> CC: Rose, Malinda
> Subject: Aetna Better Health-EPSDT
>
> Alice and Rose,
>
> I spoke to a Dr. Barnett, medical director for the Primary Care Health Services group in Allegheny County area, regarding low EPSDT/well child care rates. Dr. Barnett was able to nail down a problem with auto assigned members. Some of the PCP's being auto assigned have left the group years ago, or see only adults over 18 or over 21 (but have young children assigned), are not PCP's at all, ect. Low rates lead me to these problems.
>
> I'll also forward this to the PR rep, as Dr. Barnett volunteered an interest in fixing these PCP information problems. He feels there exists a credentialing issue.

247.    On or about February 12, 2015, Relator informed Jefferson that ABHP had terminated its contract with the Philadelphia Department of Health.

248.    ABHP never removed the Philadelphia Department of Health sites from its network, so that by the September 2016 EPSDT report there were still 249 children assigned to these facilitates.

249.    On or about February 17, 2015, Relator emailed Dawn Choi from Provider
Relations, informing her that the 1,450 children assigned to the Health Access Network had a
very low EPSDT visit rate and that children, including 2 year old boys, were assigned to
gynecologist, hospitalist and vascular surgeons. ABHP also had wrong addresses, phone numbers
and affiliations for the PCPs at this site.



250.    On February 18, 2015, in an email to Jefferson, Relator reported that ABHP's
system was aware of the correct specialty of the physicians contracting with ABHP. Specifically,
Relator checked ABHP's QNXT database to confirm if ABHP's internal databases were aware
that obstetricians and gynecologist assigned to pediatric patients, including young boys, were
actually obstetricians and gynecologist and not pediatric PCPs.

251.    Despite being informed by Relator and having the correct information about the
specialty of its contracted physicians, ABHP took no action to remove non-PCP specialists from
its pediatric PCP network.

252.    On or about February 19, 2015, Relator informed others at ABHP that its
enrollees were assigned to PCPs at Lehigh Valley Physicians Group sites that were not
contracted with ABHP.

253.    On or about February 23, 2015, Relator emailed Jefferson and Dawn Choi to
inform them that the Reading Hospital Medical Group cannot take any more ABHP patients as
the PCPs already have full panels.

254.   However, as of September 2016's monthly EPSDT compliance report, 1,127 children were still assigned to the Reading Health Physicians Network and at least 736 of those children did not have an annual EPSDT visit recorded within the previous year.

255.   On or about September 29, 2016, Relator emailed Rottman to complain about the retaliation she faced because she reported on ABHP's provide access problems.

256.   Specifically, Relator informed Rottman that ABHP pediatric enrollees "numbering in the thousands were being autoassigned to sites terminated by [ABHP] such as Philadelphia Department of Health City Health Centers, Greater Philadelphia Health Action, University of Pennsylvania Clinical Practices. . ."

257.   In the September 29, 2016 email, Relator also informed Rottman that pediatric enrollees were assigned to gynecologists, vascular surgeons, neurologists, pain managements specialists among others, "where the specialist did not agree to manage [ABHP] children as PCP."

258.   Relator further explained in her email to Rottman that Jefferson had told Relator to stop reporting these problems in September 2014 and then in around February 2015 Jefferson told Relator to only report about these problem verbally to Jefferson.

**B. Providers informed ABHP about network inadequacies**

259.   Numerous providers informed ABHP about ABHP members being assigned to PCPs no longer working at the providers' facilities. The providers also sent updated PCP lists to ABHP in order to correct ABHP's records, but ABHP refused to take corrective action.

260.   On or about January 6, 2015, in response to an email from Mitzi Richard from Sadler Health, an ABHP provider relations representative informed Richard that ABHP "cannot set the [inaccessible] provider record to inactive…"

261.    Mitzi Richard astutely noted that this "appears as a misrepresentation of the true PCP," and that ABHP's conduct was "unsettling."

262.    On or about January 20, 2015, Dr. Barnett, the Director of Primary Care Health Service, Inc., emailed ABHP with an updated list of PCPs at their facility and informing ABHP that it had inaccurate PCP information.

263.    On or about February 17, 2015, Relator emailed Choi informing her that the Health Access Network's credentialing department had sent updated PCP information to ABHP, but those updates were "never recognized."

**C.  ABHP's Internal Documentation and Procedures Make Clear That it was Aware of its Network Inadequacies**

264.    ABHP is aware of which providers it had contracts with and which providers it did not have contract with.

265.    ABHP was aware that it had terminated the contracts of the following healthcare facilities, among others, but failed to remove them from its PCP network allowing new enrollees to select or be assigned to PCP at these terminated facilities.

      a.   Philadelphia Department of Health City Health Centers

      b.    Greater Philadelphia Health Action, Inc.

      c.   University of Pennsylvania Health System

      d.   Lehigh Valley Physicians Group

      e.   Reading Health Physicians Network

      f.   Conemaugh Memorial Medical Center and Health System

      g.   Mercy Health System

266.     ABHP's QNXT database includes the correct specialty of its provider network, including the area of specialty of the specialist who are assigned as pediatric PCPs.

267.     ABHP maintains an entire department, the Provider Services Department, dedicated to monitoring, managing and developing its network of providers in order to ensure its adequacy across the Commonwealth.

**VIII.   Defendants' Conduct Caused Damage to the United States**

268.     The federal government provides about 55% of all Medicaid funding in the Commonwealth of Pennsylvania.

269.     On or about January 20, 2017, Relator attended an ABHP town hall meeting, where Darlene Dunmore, Director of ABHP's Regulatory Compliance, gave a presentation on ABHP's HealthChoices contract.

270.     During the presentation, Darlene Dunmore informed the attendees that 60% of the HealthChoices contract is federally funded and 40% is funded by the state.

271.     Pennsylvania only contracted ABHP on the belief that ABHP had an adequate provider network that could provide necessary medical services to the Commonwealth's Medicaid population.

272.     Because ABHP's network is inadequate to provide the necessary access and medical services to the Commonwealth's Medicaid population, ABHP should have not been awarded the 2010 Contract nor the 2014 Contract.

273.     Moreover, Defendants should not have received any of the per-member/per month capitated payment for any members assigned to inaccessible PCPs.  Neither these members nor the Commonwealth received any benefit for the payment provided to Defendants for these members.

274.     The government suffered damages by paying ABHP on a per member/per month basis for an adequate provider network that ABHP never provided.

IX.     **National Scope**

275.     On or about August 2013, the ABHP assigned Relator to be the Pennsylvania plan Champion for Aetna Patient Centered Medical Home (PCMH) and HEDIS Pay for Performance program. This program provided monetary incentives to physicians who met certain HEDIS performance goals.

276.     Relator was tasked with providing low performing physicians with a list of patients that required specific medical services that, when provided, would help the physician meet the HEDIS performance goals.

277.     While compiling these patient lists, Relator encountered provider accessibility problems in the entire ABHP Medicaid provider network similar to those she encountered as the EPSDT Coordinator in the ABHP's pediatric PCP network.

278.     Relator reported her findings to her manager, Jefferson, who disregarded the findings and told her to focus on compiling the patient list instead.

279.     In addition to Pennsylvania, Aetna Medicaid Administrators, LLC ("AMA") managers Medicaid programs in the following states:

        a.   Florida

        b.   Illinois

        c.   Kentucky

        d.   Louisiana

        e.   Michigan

        f.   Missouri

    g.  New Jersey

    h.  New York

    i.  Ohio

    j.  Texas

    k.  Virginia

    l.  West Virginia

280.    AMA's PCP network accessibility problems extend beyond Pennsylvania into the other states in which AMA manages Medicaid programs.

281.    AMA was formerly Schaller Anderson, LLC before it was acquired by Aetna, Inc., in 2007.

282.    AMA is Aetna Inc.'s national Medicaid subsidiary.

283.    AMA operates out of Phoenix, Arizona.

284.    Most of ABHP network information, including the monthly EPSDT compliance reports, are generated from AMA in Phoenix, Arizona.

285.    Similarly, AMA manages the network information for all its other Medicaid programs.

286.    On or about September 28, 2015, Relator, along with about 40 other employees from other AMA state programs, attended a WebEx conference led by Jessica Jamelkowski.

287.    Every attendee at the WebEx meeting reported network provider issues in their state.

288.    Jamelkowski followed up on this WebEx meeting by sending to each of the attendees a document entitled "Correcting Provider Data and Empanelment Attribution," that discusses how to improve member to PCP assignments.

289.    In 2015, Behavioral Health Concepts, Inc., conducted a study to examine the accuracy of provider information of Medicaid MCOs in Missouri.

290.    The study evaluated the accuracy of the provider phone number and address listed on the MCO's website. The study also evaluated if providers listed as accepting new patients were actually accepting new patients.

291.    Aetna Better Health of Missouri, the AMA division that manages the Medicaid program in Missouri, scored the lowest among the MCOs studied. Specifically, only about one in every two Aetna Better Health of Missouri providers sampled containing inaccurate information rendering them inaccessible.

292.    The study also found 27 Aetna Better Health of Missouri providers who had relocated or retired at least a year before this study was conducted.

**X.      ABHP Loses its Contract**

293.    In 2015 the Pennsylvania Department of Health (DOH) issued a request for proposal for the 2017 HealthChoices contract.

294.    ABHP submitted its proposal on or about April 17, 2016, but was not selected.

295.    ABHP filed a bid protest and was granted a preliminary injunction in an unreported opinion on July 6, 2016.

296.    On or about November 19, 2016, ABHP CEO Jason Rottman sent an email to ABHP employees informing them that ABHP was not selected for the 2017 HealthChoices contract. He also said that the current contract with the Commonwealth will extend only until June 1, 2017.

XI.     **Retaliation**

297.    To state a cause of action under 31 U.S.C. § 3730(h), the anti-retaliation

provisions of the False Claims Act, a plaintiff must show "(1) he engaged in protected conduct,

(i.e., acts done in furtherance of an action under § 3730) and (2) that he was discriminated

against because of his protected conduct." Dookeran v. Mercy Hospital of Pittsburgh, 281 F.3d

105, 107 (3rd Cir. 2002) (internal quotations and citations omitted).

298.    Relators engaged in protected activity as outlined above when she repeatedly

raised concerns to ABHP management including Rottman and Jefferson about ABHP's provider

access failures and false statements related to the same.

299.    In or around September 2016, Relator raised concerns that she was being

retaliated against to Aetna's Human Resources Department.

300.    Additionally, as discussed above, on or about September 29, 2016, Relator

emailed Rottman to complain about the retaliation she faced because she reported on ABHP's

provider access problems.

301.    Relator stated the following in her email to Rottman:

In about September, 2014, I began to notice, while performing the functions of
my job, that ABH pediatric MA members numbering in the thousands were being
autoassigned to sites terminated by ABH such as Philadelphia Department of
Health City Health Centers, Greater Philadelphia Health Action, University of
Pennsylvania Clinical Practices- to name a few.  I'd notified Alice.  This had not
improved at all by February, 2015.  This is still going on today, I believe.

Between December, 2014 and February, 2015 I'd noticed – children assigned to
gynecologists (including infants, males, toddlers), adult vascular surgeons,
neurologists, pain managements specialists and other specialists as PCP, where the
specialist did not agree to manage ABH children as PCP, nor did the member
choose a this specialist as PCP.  These situations were not corrected despite my
reporting them. During this time, I also noted hospitalists who practice only in
inpatient settings, assigned as PCP to ABH children, as well as Internal Medicine
doctors who do not manage patients under age 18 being assigned younger

children, toddlers and infants as PCP. I'd also noted children assigned to physicians who had died years prior, physicians who had moved practices out of state, and physicians who had left practices and groups years prior assigned to ABH MA children as PCP. Children are assigned in large numbers to non-par practices, or practices not accepting new ABH patients, and children assigned to PCP's located 100's of miles from the child's home. I'd also received verbal complaints from practices, plus written complaints regarding the physician/practice inability to stop this from happening through their own outreach to Aetna Better Health, and regarding being told "it can't be fixed, we can't do it" - by at least one PR rep in writing, which a practice forwarded to me and I forwarded to Alice.

The children involved generally do not access primary care at all. My research showed that this lack of access was likely due to ABH panels of legitimate PCP's being full, with overflow children being assigned to other-than-PCP as PCP. The children generally cannot access primary care by changing PCP, because legitimate PCP panels are full in the child's area. My research showed ER utilization for a larger number of the children so assigned, and this was made known to Alice by me. I believe that these problems still exist today. I've assessed and reported to Alice that these are not demographics problems. We have provider demographics problems, but the autoassign/access issues go beyond demographics problems.

The problems were not being corrected month over month despite me reporting to Alice and provider relations, per Alice, and despite providers attempting to correct them though ABH. Most of these discoveries were reported by me December-February 2015, but I began reporting in September, 2014 and at times was asked by Alice to stop reporting thus (sic) to her. Most reports were initially reported to Alice in writing. Alice eventually asked me again to stop sending these reports in writing, and to only report pediatric access problems to Alice verbally in about February, 2015. I was then removed from my position by Alice in March, 2015. I was forbidden to speak to coworkers or provider relations at all during this time. My processes were scrutinized and micromanaged by Alice during this time. All communication by me with anyone at the plan was only allowed through Alice. I was frequently told "you are going nowhere here" by Alice. This was followed by a poor performance evaluation in July, 2015, based on vague complaints of "communication problems" from Alice- claiming she can't understand the things I report to her because I send reports via email, or by IM, or it was too wordy, or it wasn't wordy enough, or it was communicated verbally, or I don't use bullet points, ect. (sic) I am given no credit for accomplishments, such as rate increases on projects on which I have worked. I am falsely accused by Alice, then punished based on false accusation, for example by removal from my role in the dental project.

I believe that I have been under a state of constant retaliation since February-March, 2015 for discovering and notifying my manager of the autoassign and access problems involving children. The retaliation seemed to wane in early January, 2016. But the behaviors returned starting in June, 2016. I am recently accused of conducting a child neglect investigation, questioning coworkers, and requesting medical records in order to conduct a child neglect investigation on my own, that should have been sent to SIU for investigation, per, Alice. I did no such thing, and the documentation and written correspondence will back me up in this. Child abuse/neglect investigations are not sent to be sent SIU, to the best of my knowledge, and I am requesting to be made aware if Aetna policy or my manager's instructions are that abuse/neglect cases are to be sent to SIU going forward. Abuse/neglect cases are currently called by PA Child Line mandatory reporter phone line, per Alice and per law.

I believe that I again stumbled upon a provider access problem in my most recent role in reviewing a PQoC's in June, 2016, while performing the regular duties of my job. Alice's behavior regarding only a single infusion provider being available to a child in the Philadelphia area is concerning to me in its similarity to the behaviors I experienced upon discovering PCP autoassign problems, and the lack of access back in 2015. I am concerned regarding further retaliation and removal from my current position for once again calling attention to a lack of provider availability in 2016. In both of these cases, my goal was not to uncover access problems. I discovered these access problems while working toward other goals per the duties assigned to my position at the time. I reported to my manager as is appropriate. In my role as PQoC nurse, I have also run into issues with PPC (Provider Preventable Conditions) not being managed per policy. Diagnoses and conditions that fall under the definition of PPC (Provider Preventable Condition) are being sent to me for evaluation without having gone through the PPC investigation process. This was true of the Options Care case also. PPC identification and investigation is not being consistently applied to providers, and some PPC's are not identified until I find them via medical record review, despite evidence of the PPC being known in CR notes.

I am unclear whether the inconsistencies of PPC investigation is due to provider access problems, as appears to be the case with Options Care case, which had not been investigated for PPC despite about 15 months of repeated diagnosis of central line associated blood stream infection, A PPC diagnosis per policy. My largest current concern is that I will once again removed from my position for failing to look the other way on an access problem involving a child, and for reporting PPC (provider preventable conditions) to UM when I notice them, and failing to look the other way on the Options Care case. I am also challenging false accusations, as failing to be listened to when under false accusation in the past has resulted in very difficult and negative career and financial problems for myself.

302.     After this email, Relator participated in a follow up meeting with Rottman and Jefferson in or around October 5, 2016, where Realtor shared more information about her experiences and the issues, she observed at ABHP.

303.     Relator memorialized her understanding of this meeting via email to Rottman and Jefferson on or around October 6, 2016.

304.     Shortly after Relator's meeting with Rottman and Jefferson, in retaliation for Relator raising concerns, Jefferson removed Relator's access to provider data.

305.     In October 2016, Relator was removed from her role on the HEDIS team, which would have allowed access to the provider data.

306.     Relator continued to report her concerns about ABHP's insufficient provider access to Jefferson verbally and in writing over the next year and a half.

307.     Relator was terminated by Alice Jefferson, via letter, on February 1, 2018.

308.     Relator's termination was a result of her protected disclosures and her efforts to prevent ABHP's False Claims Act violations.

309.     However, Relator's termination letter stated that "as a result of a recent organizational review" Relator's position was being eliminated.

310.     Despite this justification, Jefferson replaced Relator by hiring new people into Relator's role on the QM team before Relator's last day with ABHP.

311.     Further, Relator recalls that Jefferson hired temporary employees to work on the HEDIS QM project through June of 2018.

312.     Through her verbal and written communications, Relator engaged in protected conduct when she sought to raise awareness to the issues she observed at ABHP discussed supra.

313.     As a result of Relator's protected conduct, ABHP, through Jefferson and Rottman, retaliated against Relator by diminishing her job duties, and eventually terminating her.

314.     Because of Relator's termination, she was unemployed for 13 months and continues to experience significant economic and emotional harm.

## COUNTS

### COUNT I
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Fraud in the Inducement
### (As to the Corporate Defendants)

315.     Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

316.     The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).

317.     Courts recognize a fraud in the inducement theory of liability under the False Claims Act where a contract benefit was originally obtained through false statements or fraudulent conduct.

318.     In a fraud in the inducement claim, the fraud need not spend itself within the execution of the contract. Rather, where a contract was obtained based upon false statements or fraudulent conduct, every claim for payment which was based on the initial fraudulent action is inherently false.

319.     Aetna, Inc. established AMA and ABHP for the purposes of bidding on the 2010 and 2014 Contracts.

320.     As articulated in the foregoing paragraphs, the Corporate Defendants made false representations to the Commonwealth of Pennsylvania in order to obtain the 2010 Contract and 2014 Contract.  Defendants, in an effort to obtain these contracts, knowingly made false representations concerning the number and geographical location of PCPs within its provider network.

321.     The Corporate Defendants' fraudulent misrepresentations to the Commonwealth about the size and adequacy of its provider network led the Commonwealth to believe that the Corporate Defendants' PCP network met or would meet the network adequacy, accessibility, and composition standards set forth in the 2010 and 2014 Contracts.

322.     The Commonwealth relied upon these false representations in awarding the 2010 and 2014 Contracts to the Corporate Defendants.  But-for these false representations, the Commonwealth would not have awarded the 2010 and 2014 Contracts to the Corporate Defendants.  Accordingly, the false representations were material to the government's decision to pay.

323.     Further, in order to be eligible to bid on either the 2010 or 2014 Contracts, the Corporate Defendants were required to hold an accreditation of its healthcare plan.

324.     In order to meet this accreditation requirement, the Defendants submitted HEDIS reports to the NCQA.

325.     As discussed above, the information in these HEDIS reports is tainted because of the Corporate Defendants' misconduct.

326.     Because of the Defendants' failure to maintain an adequate PCP network, a significant number of the enrollee population  leave ABHP for another MCO.  When these

individuals leave ABHP, their participation with the MCO and MCO providers is not included in the HEDIS rate.

327.   Accordingly, the HEDIS rates reported by the Corporate Defendants to NCQA are, at best, misleading or, at worse, false.

328.   NCQA relied upon these HEDIS rates when accrediting the Corporate Defendants' healthcare plan. But-for the Corporate Defendants providing faulty HEDIS data to NCQA, NCQA would not have accredited the Corporate Defendants' plan and the Corporate Defendants' would have been ineligible even to bid on the 2010 and 2014 Contracts.

329.   The Corporate Defendants' knowingly made misrepresentations in the bidding and proposal process that go to the heart of the contract and frustrate its purpose.

330.   Whether the Corporate Defendants submitted false or fraudulent claims for payment directly to the United States or to the Commonwealth, the Defendants have either directly submitted to the United States or caused the Commonwealth to submit to the United States false claims for payment to the government.

331.   Because the United States pays for approximately 50% to 60% of all Medicaid costs in the Commonwealth, the United States has been damaged by all of the aforementioned misrepresentations.

## COUNT II
### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### False Certification
### (As to All Defendants)

332.   Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

333.    The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.   31 U.S.C. § 3729(a)(1)(A).

334.    Courts recognize a false certification theory of liability under the False Claims Act where a contractor falsely certifies that it is in compliance with regulations or contractual terms that are prerequisites to the payment of government funds.

335.    False certifications may be express or implied.

336.    An express false certification applies where a recipient of government funds falsely certifies that it is in compliance with regulations which are prerequisites to the government's decision to pay for the services rendered by the contractor.

337.    An implied false certification theory of liability applies where a recipient of government funds makes a claim for payment from the government without disclosing that it violated regulations or contractual provisions that affects its eligibility for payment.

338.    As discussed throughout this complaint, the Corporate Defendants are required to submit to the Commonwealth a multitude of reports that accurately describe their provider network. Such reports and documentation include, but is not limited to:

a.    Documentation to obtain its HMO Certificate of Authority;

b.    Documentation concerning its Service Expansion Request;

c.    The Quarterly Provider Network Report of Deletions and Additions;

d.    The Managed Care Accessibility Analysis and GEOAccess Reports;

e.    Complaint Reports; and

f.    Accreditation certifications.

339.    Accurately reporting their provider network, and, indeed, maintaining an adequate provider network per the terms of the contract and under 28 Pa. Code §§9.671-9.685, are both pre-conditions of payment.

340.    The Defendants falsely certified compliance with network adequacy and reporting requirements.  Such requirements are material to the government's decision to make payment.

341.    Whether the Defendants submitted false or fraudulent claims for payment directly to the United States or to the Commonwealth, the Defendants have either directly submitted to the United States or caused the Commonwealth to submit to the United States false claims for payment to the government.

342.    Because the United States pays for approximately 50% to 60% of all Medicaid costs in the Commonwealth, the United States has been damaged by all of the aforementioned misrepresentations.

**COUNT III**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Submitting False Claims for Payment**
**(As to All Defendants)**

343.    Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

344.    The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.   31 U.S.C. § 3729(a)(1)(A).

345.    The Corporate Defendants receive payment from the Commonwealth on a capitated per-member/per-month basis.

346.     The per-member/per-month payment is provided to the Corporate Defendants because the Corporate Defendants make available to enrollees an accessible PCP network.

347.     Because the Defendants misrepresent the adequacy of their PCP network, many of the enrollees for whom the Corporate Defendants seek payment are assigned to PCPs that do not actually accept ABHP Medicaid insurance, do not treat children, are not accepting new patients, have no experience in pediatrics, are dead, or are otherwise inaccessible.

348.     For example, none of the Pike County PCPs that the Corporate Defendants purport as being in-network are, in fact, available to see pediatric patients. The Corporate Defendants, nonetheless, assign pediatric patients to these PCPs and receive payment from the Commonwealth as a result of the fraudulent PCP assignments.

349.     The same is true for enrollees in Potter County, Jefferson County, Perry County, Forest County, and others.

350.     Moreover, even where the Defendants do have some PCPs available in a county – albeit far less than that which is represented to the Commonwealth – enrollees are routinely assigned to PCPs that do not actually accept ABHP Medicaid insurance, do not treat children, are not accepting new patients, have no experience in pediatrics, are dead, or are otherwise inaccessible.

351.     The Defendants know that assigning an enrollee to an inaccessible PCP reduces the possibility that the enrollee will seek out medical services. By reducing the possibility that the enrollee will obtain medical services, the Corporate Defendants increase their profitability to the detriment of the Commonwealth and to the children of Pennsylvania.

352.    The Commonwealth should not make a per-member/per-month payment to the Corporate Defendants for any enrollee that is assigned to an inaccessible PCP, because the Commonwealth and the children of Pennsylvania receive no benefit from such an assignment.

353.    The Commonwealth should not make a per-member/per-month payment to the Corporate Defendants for any enrollee that is assigned to an inaccessible PCP, because the Commonwealth and the children of Pennsylvania do not receive the bargained-for benefit of such an assignment.

354.    Every claim submitted for an enrollee who is assigned to an inaccessible PCP is false, because those PCPs could not access the bargained-for pediatric care.

355.    Every claim submitted for an enrollee who is assigned to an inaccessible PCP is false, because those enrollees could not access the bargained-for pediatric care or because doing so was more burdensome for the enrollee than the contract requires.

356.    As illustrated in this complaint, the Corporate Defendants are aware of the falsity of their statements.

357.    Whether the Defendants submitted false or fraudulent claims for payment directly to the United States or to the Commonwealth, the Defendants have either directly submitted to the United States or caused the Commonwealth to submit to the United States false claims for payment to the government.

358.    Because the United States pays for approximately 50% to 60% of all Medicaid costs in the Commonwealth, the United States has been damaged by all of the aforementioned misrepresentations.

**COUNT IV**
**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Creating a False Record or Statement Material to a False Claim**
**(As to All Defendants)**

359.    Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

360.    The False Claims Act imposes liability on any person or entity that knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

361.    In support of claims for their per-member/per-month capitated payment, the Defendants create false business records in the form of, *inter alia*:

> a.   The Quarterly Provider Network Report of Deletions and Additions;

> b.   The Managed Care Accessibility Analysis and GEOAccess Reports; and

> c.   Complaint Reports.

362.    These false records led the Commonwealth to believe that the Defendants were in compliance with the network adequacy provisions of the 2010 and 2014 Contracts.

363.    Defendants created these false records in order to induce the Commonwealth to pay the Defendants' fraudulent claims for payment, which the Commonwealth did.

364.    Though presentment of these false records is not required in order to establish liability under 31 U.S.C. § 3729(a)(1)(B), the Defendants did, with respect to the Quarterly Provider Network Report of Deletions and Additions, the Managed Care Accessibility Analysis, and the GEOAccess Reports, present these false records to the Commonwealth.

365.     Because the United States pays for approximately 50% to 60% of all Medicaid costs in the Commonwealth, the United States has been damaged by all of the aforementioned misrepresentations.

## COUNT V
### Violations of the False Claims Act
### 31 U.S.C. § 3730(h)
**(As to Aetna Better Health Pennsylvania, Aetna, Inc., Jason Rottman, and Alice Jefferson)**

366.     Relator incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

367.     The False Claims Act provides that an employee may not be discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of any effort to stop the submission of one or more False Claims.

368.     Relator engaged in protected activity under the False Claims Act by, among other ways:

     a.   Verbally expressing her concerns regarding ABHP's practices to Jefferson, on many occasions;

     b.   Emailing Rottman and Jefferson in September 2016 to document her concerns and past experiences with retaliation; and

     c.   Participating in a follow up meeting with Rottman and Jefferson, where Relator again expressed her concerns regarding ABHP's practices.

369.     Aetna Better Health Pennsylvania, Aetna, Inc., through Jason Rottman, and Alice Jefferson, had knowledge of Relator's protected activity as they were the recipients of her disclosures.

370.    Following Relator's protected activity, Aetna Better Health Pennsylvania, Aetna, Inc., Jason Rottman, and Alice Jefferson retaliated against Relator by diminishing her job duties and removing her access to provider data,

371.    Relator was ultimately terminated on February 1, 2018, via letter, because of her disclosures and refusal to comply with the Defendants' illegal conduct.

372.    The False Claims Act provides that Relator is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including, as is most relevant to this instant matter, litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator acting on behalf of and in the name of the United States of America, and on his own behalf, prays that judgment will be entered against Defendants for violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* as follows:

a)  That for violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus the maximum allowable civil penalty for each act in violation of 31 U.S.C. § 3729;

b)  That Relator Wessner be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

c)  That Relator Wessner be awarded all damages pursuant to 31 U.S.C. § 3730(h)(2) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

d) That the United States Government and Wessner receive all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Wessner hereby demands a jury trial.

January 11, 2021

Respectfully Submitted,

Andrew M. Stone (Bar No.: PA 35176)
STONE LAW FIRM, LLC
437 Grant Street, Suite 1806
Pittsburgh, Pa. 15219
Tele:  412-391-2005
Fax:   412-391-0853
astone@stone-law-firm.com

R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
Bar No.: VA 41770
Janel Quinn, Esq. (admitted *pro hac vice*)
Bar No: VA 89503
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2813
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
jquinn@employmentlawgroup.com

Attorneys for *Qui Tam* Relator